**2490**
Lucas M. Foletta (Nevada Bar No. 12154)
HOLLAND & HART LLP
5470 Kietzke Lane, Suite 100
Reno, NV 89511-2094
Phone: 775.327.3000
LMFoletta@hollandhart.com

*Attorneys for Plaintiff MICHAEL ANTHONY CRUZ, JR*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MICHAEL ANTHONY CRUZ, JR,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | Case No. 2:26-cv-2306-DJA |

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Michael Anthony Cruz, Jr. ("Cruz"), by and through undersigned counsel, respectfully moves this Court pursuant to Fed. R. Civ. P. 65(b) and LR 7-4 for entry of an *ex parte* temporary restraining order ("TRO") pending the earliest possible hearing on Cruz's request for a preliminary injunction.

## I. INTRODUCTION

Pursuant to LR 81-1, all pending motions previously filed in state court in this matter were automatically denied without prejudice upon the NCAA's removal of this action from the Second Judicial District Court of Nevada, Washoe County (Case No. CV26-02081) to this Court. Plaintiff Michael Anthony Cruz, Jr. ("Cruz") hereby refiles this Emergency Motion for



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

Temporary Restraining Order and Preliminary Injunction, revised to comply with the Federal Rules of Civil Procedure and this Court's Local Rules.[1]

Cruz seeks an order requiring the National Collegiate Athletic Association ("NCAA") to treat him as eligible for the 2026-2027 collegiate baseball season under the NCAA's newly adopted 5-in-5 age-based eligibility model, to permit him to enter or remain in the Division I baseball transfer portal, and to refrain from enforcing the Rule of Restitution against Cruz or any institution that rosters or competes against him under this Court's order. This Motion is supported by the Verified Complaint, the Declaration of Michael Anthony Cruz Jr. (Exhibit 1), the *Borovicanin* Order (Exhibit 2), the 2025-2026 NCAA Division I Manual (Exhibit 3), the Expert Declaration of Andrew Zimbalist (Exhibit 4), and counsel's declaration regarding notice, service and emergency conditions. Cruz brings this Motion pursuant to Fed. R. Civ. P. 65(b) and LR 7-4.

## II. THE NCAA'S REMOVAL AND ITS DILATORY EFFECT

The procedural history of this case demonstrates that the NCAA has used removal as a tactical weapon to delay Cruz's day in court and compound the irreparable harm he alleges. The timeline is as follows:

- Before filing on July 20, 2026, Plaintiff's counsel emailed a copy of the Verified Complaint and Emergency Motion to Scott Bearby, Chief Legal Officer of the NCAA, to provide advance notice of the impending filing. (Ex. 4 at ¶ 3.)
- On July 20, 2026 at approximately 3:00 PM, Cruz filed the Verified Complaint and Ex Parte Emergency Motion in the Second Judicial District Court of Nevada, Washoe County, Case No. CV26-02081. (*Id*. at ¶ 4.)
- On July 21, 2026, personal service was effected on the NCAA. (*Id*. at ¶ 5.);

[1] Note that as the supporting declarations of Michael Anthony Cruz, Jr. and Dr. Andrew Zimbalist were previously executed on state court pleading paper and filed, those affidavits have not been reproduced on federal court pleading paper to facilitate expeditious filing.

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

- On July 22, 2026, the NCAA's associate director of legal affairs directed all communications to Taylor Askew and David Zeitlin of Holland & Knight LLP. Plaintiff's counsel immediately transmitted all filings to Askew and Zeitlin. (*Id*. at ¶ 6.)
- Between July 20 and July 28, 2026, the first two judges assigned to the case recused themselves, delaying any hearing on the TRO request. (*Id*. at ¶ 7.)
- On July 28, 2026, Department 8 of the Second Judicial District Court accepted the case and set a hearing on Cruz's TRO request. (*Id*. at ¶ 8.)
- At approximately 5:30 PM on July 28, 2026, the NCAA file its Notice of Removal to this Court. (*Id*. at ¶ 9.) The NCAA provided a curtesy email (not the Notice of Removal) to Cruz's counsel at approximately 6:56 a.m. on July 29, 2026 (*Id*. at ¶ 10.)
- After Cruz's counsel requested a copy of the Notice of Removal by email, the NCAA provided it at 8:55 a.m. (*Id*. at ¶ 10.)
- At no time prior to filing the Notice of Removal did counsel for the NCAA make an appearance in the case. (*Id*. at ¶ 11.)

The NCAA's timing was not coincidental. The NCAA had full notice of this matter and the emergency nature of the proceedings on July 20 and could have removed at any time during the eight days between July 20 and July 28. It chose not to. Instead, it waited until a state court set the TRO hearing—after two previous judges recused—and only then did it file for removal, specifically to prevent Cruz from being heard and to cause further delay in these proceedings.

The NCAA's dilatory and punitive tactics are inconsistent with the NCAA's own governing principles and further support Cruz's claim that the NCAA's refusal to apply the 5-in-5 Rule to him is violative of state and federal law. The NCAA Constitution's Article 1-C commits all individuals associated with intercollegiate athletics to "fundamental values" including "respect, fairness, civility, honesty, [and] responsibility." Article 1-D mandates "fairness, openness and honesty" in relationships with student-athletes. The NCAA's litigation tactics—delaying removal until the last possible moment to prevent a 22-year-old student-athlete

from receiving a prompt hearing—are the antithesis of these commitments and further demonstrate the NCAA's bad faith toward Cruz.

The NCAA's removal also compounds the very irreparable harm Cruz alleges. Division I baseball programs require *rostered* players to report over the next 2-6 weeks. Every day of delay caused by the NCAA's procedural maneuvering narrows the window within which Cruz can be rostered for the upcoming season and receive a reporting date. The NCAA's dilatory tactics should not be rewarded; they should strengthen the Court's assessment of emergency circumstances.

## III. REQUEST FOR RELIEF

Cruz respectfully requests that the Court issue an *ex parte* TRO now and set Cruz's request for a preliminary injunction for hearing as soon as possible. Specifically, Cruz requests that the Court take the following action:

a. Enjoin the NCAA from enforcing the spring-2026 carve-out to the 5-in-5 Rule against Cruz, including because that carve-out violates Sherman Act Section 1, Clayton Act Section 16, Nevada's Unfair Trade Practices Act, and Nevada contract and implied-covenant principles;

b. Issue an *ex parte* temporary restraining order, pending a preliminary-injunction hearing, ordering the NCAA to treat Cruz as eligible for the 2026-2027 season and to refrain from applying the spring-2026 carve-out against him;

c. Set Cruz's motion for preliminary injunction for hearing at the earliest possible date and issue a preliminary injunction continuing the TRO relief through the pendency of this litigation;

d. Order the NCAA to permit Cruz to enter or remain in the Division I baseball transfer portal, or alternatively to prohibit the NCAA from enforcing any portal deadline or eligibility certification rule that would prevent Cruz from being recruited, contacted, offered, rostered, compensated, or treated as eligible by any Division I institution during the pendency of the TRO and preliminary injunction;

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

e. Enjoin the NCAA from enforcing the Rule of Restitution, or any similar penalty or adverse consequence, against Cruz, any institution at which Cruz competes, or any institution that competes against him pursuant to this Court's order;

f. Waive the bond requirement or set bond at a nominal amount pursuant to Fed. R. Civ. P. 65(c), because the NCAA will suffer no cognizable monetary harm from preserving Cruz's eligibility while the Court promptly hears the preliminary-injunction request.

**IV. NEED FOR EMERGENCY RELIEF**

This Motion is brought on an emergency basis because the Division I baseball transfer and roster market is moving now, and any delay will permanently impair Cruz's ability to secure a Division I roster spot, NIL and revenue-sharing opportunities, and MLB Draft exposure for the 2026-2027 season. If this Court does not issue immediate TRO relief, Cruz may be foreclosed from meaningful recruitment and roster placement regardless of what the Court later orders on the merits.

The NCAA's removal tactics have cost Cruz ten additional days to the filing of this Motion and heightened the emergency. The NCAA has had notice of this action since July 20, 2026—and certainly since July 21, 2026 when they were personally served—and chose to delay removal until July 28—the very day the state court set a hearing—specifically to prevent Cruz from being heard. The removal required further effort on Cruz's part to reconstitute this Motion amongst the host of considerations endemic to any litigation. That manufactured delay further compresses the timeline for meaningful relief.

The transfer portal and eligibility certification system operate as gatekeeping mechanisms for Division I baseball opportunities. Cruz cannot obtain meaningful recruitment, roster placement, or compensation while the NCAA treats him as ineligible because he exhausted four seasons by spring 2026 and was carved out of the 5-in-5 Rule. Nevada's athletic department compliance officer confirms that the NCAA's eligibility certification system will not permit

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

entry or meaningful processing for a student-athlete it classifies as ineligible. (Cruz Decl. at ¶¶ 15, 20-21.)[2]

The Verified Complaint and supporting declarations establish that Cruz has concrete Division I, NIL, revenue-sharing, and professional-development opportunities that depend on immediate eligibility. Cruz entered the transfer portal with a designation that his availability is subject to a fifth year of eligibility, and two top-tier Division I baseball programs have expressed interest in rostering him if his eligibility continues. (*Id.* at ¶¶ 19-20.) Without immediate relief, those opportunities will be permanently lost. Cruz respectfully requests the Court issue TRO relief on an *ex parte* basis and set the preliminary-injunction hearing on the earliest available date.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

On June 23, 2026, the NCAA Division I Cabinet unanimously voted to adopt a new age-based eligibility model granting Division I athletes five seasons of competition within a five-year window. Yet in implementing this rule, the NCAA arbitrarily carved out an entire class of student-athletes—those who completed their fourth season by spring 2026—from the rule's benefits. That carve-out leaves Cruz, the 22-year-old Mountain West Conference batting average leader, without eligibility despite the NCAA's own determination that five years of eligibility is appropriate.

Federal law authorizes emergency injunctive relief when a plaintiff shows a likelihood of success and irreparable injury absent relief. Cruz satisfies that standard. On the merits, the NCAA's carve-out violates Sherman Act Section 1 because it is an agreement among the NCAA and its competing member institutions that restrains competition in the market for Division I baseball player services, including through horizontal buyer-side price fixing, wage fixing, and compensation suppression. Clayton Act Section 16 authorizes injunctive relief to prevent

[2] Declaration of Michael Anthony Cruz in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is attached here as **Exhibit 1**.



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

threatened loss from that unlawful restraint. The same conduct violates Nevada anticompetition law, including NRS Chapter 598A, and breaches Nevada contract principles and the covenant of good faith and fair dealing by arbitrarily denying Cruz the benefit of the eligibility framework under which the NCAA and its members regulate his participation.

The NCAA has already adopted the less restrictive alternative—a five-year eligibility model—and simply refuses to apply it to Cruz's class. That decision confirms both the antitrust and contract law defects: the NCAA cannot justify excluding only athletes who completed their fourth season by spring 2026 from the same age-based eligibility model it now recognizes as appropriate. The roster, portal, NIL, and professional-development deadlines make judicial intervention imperative. As Nevada's athletic department compliance represented to Cruz, there is no administrative remedy available—no waiver, no appeal, and no committee to petition. Judicial intervention is the only avenue for relief.

This Court should also be aware that, on July 9, 2026, the Court of Common Pleas for Hamilton County, Ohio granted a preliminary injunction against the NCAA in *Borovicanin v. NCAA*, Case No. A2603352, involving the same NCAA 5-in-5 Rule and the same exclusion of athletes who completed four seasons before the new rule took effect. Although not binding on this Court, *Borovicanin* is persuasive because it involved a similar class of defendant, the same carve-out, and the same practical injury: a narrow class of athletes denied a fifth season while athletes before and after them received that opportunity.[3] *Borovicanin* at 2. *Borovicanin* confirms that the relief Cruz seeks is not novel. The Ohio court found a substantial likelihood of success on a contract theory, found irreparable harm from the loss of a final collegiate season and professional exposure, rejected the NCAA's third-party-harm arguments where plaintiffs sought only the opportunity to compete for available roster spots, and granted transfer-portal relief to make eligibility relief meaningful. *Borovicanin* at 5-8.

As more specifically described below, Cruz's requests are also supported by this court's decisions in *Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109 (D. Nev. 2025)

[3] The *Borovicanin* Order is attached here for the Court's convenience as **Exhibit 3**.

and *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 840 (D. Nev. 2025). In light of these authorities—and others cited below—the Court should grant this Motion.

## II. STATEMENT OF FACTS

Cruz was born in 2003 and is 22 years old. (Cruz Decl.¶ 2.) For nearly his entire life his days have been spent playing, practicing, and honing his skills in the game he loves: baseball. (*Id.* ¶ 5.) He has been steadfastly dedicated to the game in hopes of playing not only Division I baseball but professional baseball too. (*Id.*)

Upon graduating high school, where Cruz was a stand-out performer in northern Nevada, he entered the College of Southern Nevada ("CSN"). (*Id.* ¶ 6.) Cruz played two seasons of junior college baseball at CSN (2022-2023 and 2023-2024) before realizing his dream to play Division I baseball. Following the 2023-2024 season, Cruz was rostered by UNLV (2024-2025). (*Id.* ¶ 7.) The next season Cruz transferred home to play for the University of Nevada, Reno (2025-2026). (*Id.* ¶ 8.) During his collegiate career, Cruz did not take a redshirt or receive a medical hardship waiver. (*Id.* ¶ 9.)

The 2025-2026 season for the Wolfpack was Cruz's best year. Cruz led the Mountain West Conference in batting average (.403) and ranked among the conference's top performers in several other offensive categories. (*Id.* ¶ 10.) In conference play, he ranked in the Mountain West top 10 in doubles (10, T-third), on-base percentage (.469, seventh) and slugging (.605, 10th). (*Id.*) For his performance, Cruz was named to the All Mountain West Second Team and the ABCA West All-Region Second Team. (*Id.*)

Cruz's on-field success through his collegiate playing years did not come without challenge. Since beginning play at CSN, Cruz has regularly competed against substantially older players, including players who have played five or more years of college baseball, because rosters were expanded to accommodate COVID-era eligibility relief when he entered college. (*Id.* ¶ 26.) Cruz also rose to the Division I level despite the NCAA granting a blanket waiver to an entire class of Division I athletes with junior college years as a result of litigation brought by Diego Pavia that created intense roster competition and an expanded pool of eligible Division I

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

athletes (the "Pavia Waiver"). (*Id.* ¶ 26.)[4] It bears reiterating that Cruz did this without the benefit of a redshirt year or waiver to extend his eligibility and physical development.

On June 23, 2026, the NCAA adopted a new eligibility framework for Division I athletes—the 5-in-5 Rule. (Verified Compl. ¶ 22.) However, in an inexplicable twist, after years of granting eligibility dispensation for COVID, legal challenges and redshirt protocols, the NCAA decided not to make Cruz's class subject to the rule. In unceremonious fashion, the NCAA announced that student-athletes like Cruz who completed their fourth season by spring 2026 would receive "no additional eligibility." (*Id.* ¶ 25; Zimbalist Decl, Ex. 10) The NCAA further announced, however, that athletes in other classes *would* receive the benefit of the new model if it inured to their benefit. (Verified Compl. ¶ 25; Zimbalist Decl., Ex. 10.)

The NCAA's action was more than disappointing to Cruz. After breaking through and having his standout year, the NCAA opened the door for Cruz's more junior teammates to continue their careers—and their earning potential—while arbitrarily pulling the rug out from under Cruz. (Cruz Decl. ¶ 29.)

That notwithstanding, in the hopes of finding a way to fulfill his full potential as a Division I athlete, Cruz entered the transfer portal on June 30, 2026 with a designation that his availability would be subject to the grant of a fifth year of eligibility. (*Id.* ¶¶ 17-18.) Almost immediately, two top-tier Division I baseball programs contacted Cruz about rostering him if his eligibility continues. (*Id.* ¶ 19.) These programs have significant NIL budgets and would provide enhanced MLB Draft exposure and development opportunities; Cruz believes annual NIL compensation from either school could exceed $100,000 if he is eligible. (*Id.* ¶¶ 19, 22-24; Verified Compl. ¶¶ 42-46.)

The near immediate interest in Cruz as a Division I athlete validated his own belief in the market opportunities available to him but for the NCAA's decision not to make the 5-in-5 Rule applicable to his class. Cruz conferred with Nevada's athletic department compliance office, which confirmed that Nevada cannot process Cruz as an unconditional transfer-eligible athlete

[4] See attached **Exhibit 4** from ESPN reporting the issuance of the Pavia Wavier.

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

because the NCAA's eligibility certification system treats him as having exhausted eligibility, and Nevada's baseball program likewise cannot continue to roster him under NCAA standards. (Cruz Decl. ¶¶ 20-21.) Nevada's compliance office also informed Cruz that no waiver application, appeal, or committee petition is available for athletes in Cruz's position, and that the waiver exceptions under the new framework do not apply to Cruz. (*Id.* ¶¶ 15, 30; Verified Compl. ¶¶ 38-41.) In other words, in the absence of relief from this Court, Cruz's playing career is over.

Professor Andrew Zimbalist's expert declaration confirms why that exclusion has immediate market consequences. In his preliminary opinion, the relevant market is the market for Division I college baseball player services in the United States; Division I baseball is economically distinct from lower levels because of NIL compensation concentration, revenue-sharing eligibility, scholarship investment, coaching and facilities infrastructure, and MLB Draft exposure. (Zimbalist Decl. ¶¶ 9-20.)[5] He further explains that the NCAA possesses monopsony power because no institution may unilaterally declare Cruz eligible, no competing organization offers an equivalent Division I baseball product, and the NCAA is the sole gateway to the compensation, roster, and scouting opportunities at issue. (*Id.* ¶¶ 21-24.)

Professor Zimbalist also identifies concrete anticompetitive effects from the spring-2026 carve-out: the NCAA fixes Cruz's Division I price at zero by prohibiting every Division I program from signing him; artificially removes a class of experienced athletes from the labor supply available to Division I institutions; eliminates NIL, revenue-sharing, scholarship, and roster-compensation opportunities that would otherwise be set by market competition; and forecloses professional-development opportunities available through Division I baseball. (*Id.* ¶¶ 25-31, 43-47.)

## III. LEGAL STANDARD FOR EMERGENCY INJUNCTIVE RELIEF

[5] The Expert Declaration of Andrew Zimbalist in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is attached here as **Exhibit 5**.

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

Under Fed. R. Civ. P. 65(b)(1), a court may issue a temporary restraining order without notice to the adverse party if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the movant's attorney certifies in writing the efforts made to give notice and the reasons notice should not be required. A TRO expires no later than 14 days after entry unless extended for good cause. Fed. R. Civ. P. 65(b)(2). The court must set the preliminary injunction hearing at the earliest possible time. Fed. R. Civ. P. 65(b)(3).

For a TRO or preliminary injunction in the Ninth Circuit, the movant must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Medrano-Rocha v. Santacruz*, 817 F. Supp. 3d, 871, 876 (C.D. Cal. 2026) (noting, "[t]he standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.") Alternatively, under the Ninth Circuit's "serious questions" test, a preliminary injunction is appropriate when there are "serious questions going to the merits" and a balance of hardships that tips sharply toward the plaintiff, so long as the plaintiff also shows a likelihood of irreparable harm and that the injunction is in the public interest. *Cottrell*, 632 F.3d at 1131-32.

## IV. ARGUMENT

### A. The Court must grant injunctive relief because Cruz has demonstrated a likelihood to succeed on the merits

#### 1. The NCAA's Conduct Violates State Contract Law

Under the NCAA's governance structure, each member institution's participation in the NCAA is governed by the NCAA Division I Manual, which incorporates the NCAA's Constitution and Bylaws. (NCAA Manual at Sec. 2 (Organization of NCAA Manual).)[6] The Manual's Constitution and Bylaws are binding on member institutions and directly regulate

[6] The NCAA Manual is attached here as **Exhibit 6**.

student-athletes' eligibility, competition, benefits, and participation. (*See e.g. id*.) Courts have recognized that student-athletes are direct, intended beneficiaries of these governing documents, not merely incidental beneficiaries, and therefore student-athletes may bring contract actions on their bases. *See Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623-24 (Colo. Ct. App. 2004); *Borovicanin*, at 5-6. Accordingly, Cruz has standing to enforce the Manual's commitments as a third-party beneficiary of the membership agreement. *Cf. Jasvinder Singh v. Second Jud. Dist. Ct.*, 586 P.3d 858, 864-65 (Nev. 2026) (recognizing a corporation's governance bylaws may create enforceable obligations running to members).]

Nevada law recognizes that every contract carries an implied covenant of good faith and fair dealing. *See Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 232-33, 808 P.2d 919, 922-23 (1991) (*Hilton I*); *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 109 Nev. 1043, 1046, 862 P.2d 1207, 1209 (1993) (*Hilton II*). Under that framework, where one party performs a contract in a manner that is "unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith." *Hilton I*, 107 Nev. at 234, 808 P.2d at 923. Even where a party literally complies with a contractual term, it may breach the implied covenant if it "deliberately countervenes the intention and spirit of the contract." *Id.* at 232, 808 P.2d at 922-23. Whether the controlling party's actions fall outside the reasonable expectations of the dependent party is determined by the various factors and special circumstances that shape those expectations. *Hilton I*, 107 Nev. at 234, 808 P.2d at 924.

The NCAA's Manual includes express commitments to student-athletes that the spring-2026 carve-out violates. Article 1-C of the NCAA Constitution provides that "[a]ll individuals associated with intercollegiate athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty, responsibility, academic integrity, [and] ethical



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

conduct." (NCAA Manual, Art. 1-C.) Article 1-D requires that intercollegiate athletics be conducted "in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes" and mandates that "coaches and administrators exhibit fairness, openness and honesty in their relationship with student-athletes." (*Id.*, Art. 1-D.) And Bylaw 16.13.1.1, effective July 1, 2025, expressly ties institutional benefits-pool eligibility to "the individual's period of eligibility to participate in intercollegiate athletics (see Bylaw 12.6)." (*Id.*, Bylaw 16.13.1.1.) By arbitrarily truncating Cruz's eligibility, the NCAA has denied him not only the opportunity to compete but also the financial entitlement the Manual itself conditions on eligibility status.

The NCAA has determined that five years of eligibility is appropriate for Division I baseball and has adopted that model for incoming athletes and athletes with eligibility remaining; unfortunately, it denied that same benefit only to athletes like Cruz who completed their fourth season immediately before the new model became effective. That arbitrary line-drawing deprives Cruz of the benefit of the NCAA's eligibility framework thus frustrating the reasonable expectations created by the NCAA's own rules—to a fair and equitable opportunity to compete.

The NCAA simply cannot credibly argue that it satisfied its fairness obligation to Cruz by denying him the ability to participate under the same eligibility framework as more junior members of his own team. The NCAA's conduct is particularly ironic in that Cruz is being penalized for doing exactly what the prior framework encouraged: competing in all available seasons without redshirting or seeking special dispensation. Cruz's stalwart commitment to his athletic career—and his ability to successfully compete for four successive seasons—should not be used against him to facilitate the NCAA's "transition" to the new rule.

*Borovicanin* is instructive on this point. *Borovicanin* is being brought by twenty-four collegiate basketball players who are class of 2026 completers. *Borovicanin* at 2. Like Curz, the plaintiffs are challenging the NCAA's failure to apply the 5-in-5 Rule to their class on the basis of Ohio contract and the Ohio Consumer Sales Protection Act. *Id.* at 5. There, the court granted the plaintiffs' request for a preliminary injunction in connection with their breach of contract

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

claims. *Id*. at 13-14. In doing so, the court found that NCAA Manual and Bylaw provisions were clearly intended to benefit student-athletes, that student-athletes were not merely incidental beneficiaries of the NCAA eligibility framework, and that the NCAA's selective exclusion of one class from the new five-season model likely supported breach-of-contract relief. *Id*. at 5-8. More specifically, the court found that the "NCAA's eligibility rules have been applied in an arbitrary and capricious manner." *Id*. at 7.

The same contractual logic applies here under Nevada law: Cruz is the direct object of the NCAA eligibility rules, the Manual's eligibility framework is the source of the benefit the NCAA administers—including economic benefit—and the NCAA's carve-out deprives Cruz of that benefit while extending it to athletes before and after him. In doing so, the NCAA has acted arbitrarily and capriciously. Failing to afford Cruz the same opportunity for a fifth season of competition within five years of his enrollment while allowing it for more junior players on his own team passes understanding. It offers a clear and concrete opportunity for those athletes to continue their careers—and extent their earning potential—while Cruz, at his peak, is forced to sit on the sidelines.

The arbitrariness of the NCAA's action is perhaps best viewed in light of the alternative. The NCAA could just as easily made the rule applicable to all those who are eligible under its own terms without creating the "chaos" it will no doubt claim arises from the relief Cruz seeks. Cruz is not, for example, a 28-year-old former collegiate athlete seeking a fifth year of competition well beyond five years of enrollment or the age of 19. He is simply seeking to have the NCAA's own rule made applicable to him.

For these reasons—just as in *Borovicanin*—the Court must grant this Motion.

**2. The NCAA's Carve-Out Violates Sherman Act Section 1**

The NCAA's carve-out is subject to Sherman Act scrutiny. The Supreme Court has rejected special antitrust immunity for the NCAA and applies ordinary rule-of-reason analysis to NCAA restraints in modern college athletics. *NCAA v. Alston*, 594 U.S. 69, 94-97 (2021). The same Court has recognized that NCAA rules are horizontal agreements among schools that must

be assessed in light of current market realities, and that while some coordination is necessary to create college sports, not every restraint adopted under the NCAA umbrella receives deference. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101-04 (1984); *Alston*, 594 U.S. at 90; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 n.7 (2010).

Under the rule of reason, the Court conducts a fact-specific assessment of market power, market structure, and the restraint's actual effect on competition. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43 (2018). The plaintiff may show anticompetitive effects through direct evidence of actual detrimental effects or through indirect evidence consisting of market power plus evidence that the restraint harms competition. *Id.*; *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-461 (1986). If Cruz shows substantial anticompetitive effects, the burden shifts to the NCAA to identify a procompetitive rationale, and if it does so, Cruz may show that the claimed efficiencies can be achieved through substantially less restrictive means. *Alston*, 594 U.S. at 96-97. Cruz satisfies each step.

First, the challenged restraint has substantial anticompetitive effects in the relevant market. The NCAA and its competing member institutions collectively adopt and enforce eligibility rules governing access to Division I rosters, recruiting, NIL opportunities, revenue-sharing opportunities, scholarships, and professional-development exposure. (Zimbalist Decl. ¶¶ 9-24.) Division I institutions are horizontal competitors for baseball player services, and no individual institution may decide to recruit, roster, compensate, or play Cruz if the NCAA deems him ineligible. (*Id.* ¶¶ 21-24.) By declaring Cruz ineligible and blocking portal access and rostering, the NCAA suppresses competition for Cruz's athletic services, reduces the eligible labor supply, and prevents member institutions from competing to recruit, roster, and compensate him for the 2026-2027 season. (*Id.* ¶¶ 25-31, 43-47.)

The restraint also functions as horizontal buyer-side price fixing, wage fixing, and compensation suppression. Division I institutions collectively agree, through NCAA rules, to declare Cruz and similarly situated athletes ineligible, thereby setting the price those athletes may receive for Division I baseball services at zero and eliminating institutional competition that



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

would otherwise determine scholarships, NIL opportunities, revenue-sharing payments, roster compensation, and related economic benefits. That is an especially direct restraint in a labor market where the NCAA and its members exercise monopsony power. *See Alston*, 594 U.S. at 90.

Second, the NCAA cannot carry its burden to identify a cognizable procompetitive justification for excluding Cruz's class from the rule it has adopted for everyone else. Any asserted interest in preserving academic alignment, competitive balance, or the distinctive character of college athletics is undermined by the NCAA's own conduct: the NCAA has determined that five seasons of competition within five years is consistent with those objectives, and it has made that model available to later classes and to athletes with eligibility remaining. (Zimbalist Decl. ¶¶ 31, 37-41, 46.)

Courts considering analogous NCAA eligibility restraints have rejected generalized and disingenuous justifications that merely repackage harm to athlete in service of the interests of "balance" between current and prospective student-athletes. In *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 840 (D. Nev. 2025), for example, this Court granted the plaintiff's motion for preliminary injunction against the NCAA. In *Braham*, the plaintiff, a Nevada football player, sued the NCAA alleging that its five-year rule[7], amongst other eligibility rules impacting junior college transfers, limited an athlete's eligibility to four competitive seasons in five years constituted an unlawful restraint of trade under the Sherman Act. *Id*. at 828. The court granted the preliminary injunction, concluding that the five-year rule had a substantial anticompetitive effect and rejecting the NCAA's overbroad justifications. *Id*. at 836.

As to the NCAA's claim that the eligibility rules at issue "enhance access to college football and improve the student-athlete experience by ensuring more prospective student-athletes can enjoy the collegiate experience," the court referred to the district court's decision in

[7] The five-year rule governed eligibility prior to adoption of the five in five rule; it allowed Division athletes to compete in four seasons during a five-year period. *Braham*, 794 F. Supp. 3d at 838.

*Pavia v. NCAA*, 760 F. Supp. 3d 527 (M. Dist. Tenn. 2024), granting the plaintiff's motion for preliminary injunction:

> As the *Pavia* court observed, given the NCAA's exceptional "treatment of other student-athletes with comparable or more post-secondary experience" under Bylaw 12.8.1.2, its claim that eligibility rules are needed to "prevent age and experience disparities and preserve the quality of experience" is unconvincing. The Court therefore finds the NCAA has not satisfied its burden of advancing a procompetitive rationale for its eligibility restraints.

*Id*.

In the case of a UNLV football player making a similar challenge, *Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109 (D. Nev. 2025), this Court reached a consistent result. In *Martinson*, the plaintiff challenged the five-year rule for the substantially same reasons as Braham (application of Juco years against eligibility under the five-year rule). *Id*. at 1118. The NCAA defending the rule by claiming the rule had "undeniable procompetitive effects, including (1) preserving college athletics as a unique product that is differentiated from professional sports; (2) expanding opportunities for prospective and current student-athletes; and (2) better aligning athletics and academics." *Id*. at 1129. The court rejected the NCAA's rationale in pointed language: "construing the harm to student-athletes as a benefit to consumers does not justify the antitrust harm in the relevant labor market based upon the exclusion of certain otherwise qualified workers—JUCO athletes." *Id*. This Court should similarly reject any such repacking of harm to Cruz as a benefit to others.

This Court made a similarly instructive ruling in *Blythe v. NCAA*, 3:26-cv-00100-ART-CSD in granting the plaintiff's request for a temporary restraining order and preliminary injunction. There, the Court stated that "the concern that non-DI athletes will take the spots of less experienced incoming freshmen and deprive them of the opportunity to compete is not persuasive in the face of the transfer portal, which allows DI programs to fill roster spots with experienced players from other schools." *Blythe*, Order on Motion for Temporary Restraining Order/Preliminary Injunction at 10.

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

We note that the *Blythe* TRO and preliminary injunction was vacated by the Ninth Circuit. *Blythe v. NCAA*, Ninth Circuit Case No. No. 26-1106. However, the court's decision includes no rationale and notes that "an opinion explaining this disposition will follow." *Id*. at 1. To date, no written opinion has followed though the order was entered April 8, 2026. Apart from the fact that, under Ninth Circuit Rule 36-3 "[u]npublished dispositions and orders . . . are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion", the absence of any rational makes it impossible to apply.

What is clear is that other circuits—whose decisions are not binding on this Court—that have struck down preliminary injunctions against eligibility challenges have found defects in the plaintiffs' evidence of the relevant market. Both the Seventh Circuit and Fourth Circuit reached similar decisions in *Fourqurean v. NCAA*, 143 F.4th 859, 870 (Fourth Cir. 2025) and *Robinson v. NCAA*,  172 F.4th 271, 294-295. In both *Fourqurean* and *Robinson*, neither plaintiff put forward specific factual evidence of the existence of a market for their services. *Fourqurean*, 143 F. 4th at 870 (noting that the district court relied on ; *Robinson*, 172 F. 4th at 294-295 (noting that the players provided "no factual evidence".) In both cases the plaintiffs relied on the Supreme Court's decision in *Alston* as evidence of the market. *Fourqurean*, 143 F. 4th at 870; *Robinson*, 172 F. 4th at 293. Similarly, Blythe relied on the market definition from *Alston*. *Blythe*, Case No. 3:26--cv--00100, Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction at 10-12. Blythe did not provide any specific evidence—expert declaration or otherwise—of the relevant market outside his legal pleadings. *Id*.

That is not the case here. Dr. Zimbalist is a nationally renown sports economist whose declaration speaks in detailed terms to the existence of a market for Division I baseball players and the NCAA's influence over that market. (Zimbalist Decl. ¶¶ 1-24.) He also speaks to the specific anti-competitive effect of not making the 5-in-5 Rule applicable to Cruz. (*Id*. ¶¶ 25-48.) Cruz has done more than enough to establish, for purposes of this motion, the existence of the relevant market. To be sure, he is not relying on the "antiquated market definitions" found deficient in *Robinson* and *Fourqurean*.

Third, the less restrictive alternative is not speculative. The NCAA's own 5-in-5 Rule is the less restrictive alternative: apply the same eligibility model to Cruz that the NCAA will apply to athletes whose eligibility remained after 2025-2026 and to incoming athletes who will compete in the same Division I baseball market. The NCAA cannot plausibly claim administrative impossibility or competitive harm from applying its own rule to a 22-year-old athlete who is academically eligible, physically healthy, and already within the same college-baseball cohort the new rule governs. (Cruz Decl. ¶¶ 2, 4, 27-30; Zimbalist Decl. ¶¶ 38-41, 46.)

On this point, the Court should distinguish Cruz's circumstances from, for example, a collegiate athlete seeking to extend his or her career *after* being granted dispensation from the NCAA under the eligibility framework the athlete previously competed under. In *Reineri Andreu Ortega v. NCAA*, 2026 WL 1847877 (S.D. Iowa Apr. 23, 2026), the court denied a preliminary injunction after concluding that a 28-year-old Cuban wrestler (the plaintiff) who enrolled in college in 2016, trained with the Cuban national team, received two NCAA waivers, and sought to wrestle in 2026 and 2027 had not developed a sufficient record on the relevant wrestling market, anticompetitive effects, or less restrictive alternatives to the ordinary five year clock. *Id.* at 1-10. The court nevertheless recognized that NCAA eligibility rules in the NIL and revenue-sharing era are commercial, that denied athletes suffer irreparable harm, and that generalized third-party disruption arguments were speculative. *Id.* at 4-5, 10-11.

Cruz is in a materially different posture. He is not a 28-year-old former national-team athlete seeking an exception to the NCAA's preexisting five-year clock after two prior waivers. He is a 22-year-old Division I baseball player who completed four seasons on the ordinary timetable, remains academically eligible and physically healthy, and asks only to be treated under the NCAA's newly adopted 5-in-5 Rule without dispensation. Unlike *Reineri*, Cruz also presents targeted expert economic evidence defining the Division I college baseball player-services market, explaining the NCAA's monopsony power, and identifying concrete anticompetitive effects from the carve-out. (Cruz Decl. ¶¶ 2, 4, 9, 27-30; Zimbalist Decl. ¶¶ 9-31, 43-47.)



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

**3. The NCAA's Carve-Out Violates Nevada Anticompetition Law**

Nevada's Unfair Trade Practices Act, NRS Chapter 598A, independently prohibits the same anticompetitive conduct. NRS 598A.060(1) provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce in this state is illegal." NRS 598A.050 mandates that "[t]he provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." That statutory directive means the federal antitrust analysis set forth above applies with equal force to Cruz's Nevada claim. *Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co.*, 134 Nev. 463, 465, 423 P.3d 605, 607 (2018) (NRS 598A.050 "adopts by reference the case law applicable to the federal antitrust laws"). Accordingly, the same rule-of-reason framework, market definition, evidence of anticompetitive effects, assessment of procompetitive justifications, and less-restrictive-alternative showing all govern under NRS Chapter 598A. The UTPA was enacted to protect "competition for the benefit of consumers." *Nev. Recycling*, 134 Nev. at 466, 423 P.3d at 608; *see also* NRS 598A.030(1)(A) (declaring that the Legislature finds "the free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada.")

The NCAA and its member institutions jointly control access to the national Division I baseball player-services market, including roster opportunities, NIL opportunities, revenue-sharing opportunities, scholarships, and professional-development exposure. By declaring Cruz ineligible and blocking meaningful portal access, the NCAA restricts Cruz's ability to sell his athletic services in Nevada and restricts member institutions' ability to compete for those services in violation of NRS 598A.060.

The same facts also support a Nevada price-fixing or compensation-suppression theory. The NCAA and competing member institutions collectively enforce rules that eliminate compensation for Cruz's Division I baseball services by treating him as ineligible, even though programs have expressed interest in rostering him if his eligibility continues. The NCAA's own adoption of the 5-in-5 Rule establishes that a less restrictive alternative exists, and the NCAA

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

cannot justify excluding only the immediately preceding class of otherwise eligible athletes from the same age-based model while allowing others to take whichever system is more favorable. Because NRS 598A.050 requires harmony with federal antitrust jurisprudence, the decisions of this District's federal courts in *Braham* and *Martinson*—both of which enjoined NCAA eligibility rules under the Sherman Act—are directly instructive on the state-law claim.

**B. Cruz Will Suffer Irreparable Harm Absent Relief**

Cruz will suffer immediate and irreparable harm absent TRO relief. While the preliminary-injunction request can be heard on an expedited schedule, Cruz cannot wait for ordinary motion practice because Division I programs are making roster, NIL, revenue-sharing, and player-development decisions now. If the NCAA continues to treat Cruz as ineligible while this Court schedules the preliminary-injunction hearing, schools interested in Cruz will fill their roster spots, allocate NIL and revenue-sharing budgets elsewhere, and move forward without him.

A collegiate athletic season, once lost, can never be recovered. Courts have routinely recognized that the loss of playing time, competitive development, and related NIL opportunities is irreparable because the opportunity cannot be recreated after the season passes. *Braham*, 794 F. Supp. 3d at 838 ("The Court finds that the denial of the opportunity to play sports is irreparable harm."); *Pavia*, 760 F. Supp. 3d at 544 ("This Court has no trouble concluding, as many other courts have, that the denial of the ability to play sports is irreparable harm"); *Martinson*, 804 F. Supp. 3d at 1131 ("The Court finds Martinson stands to suffer immediate and irreparable harm by being disqualified from the 2025-2026 season. In so concluding, the Court agrees with many others that have found that a student-athlete's loss of opportunity to play sports is irreparable."); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 599 (N.D.W. Va. 2023) (noting "Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (internal citations omitted).

This harm cannot be remedied by money damages. A lost Division I baseball season cannot be recreated after the fact. Nor can a later order restore the precise recruiting window,

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

roster opportunities, NIL budgets, revenue-sharing opportunities, high-level competition, and MLB scouting exposure available now. As Cruz explains, the 2026-2027 baseball season cannot be replayed, that scouting exposure cannot be recreated, that NIL and revenue-sharing opportunities are contingent on time-sensitive eligibility, and that his physical prime as an athlete is finite. (Cruz Decl. ¶¶ 22-25.) Professor Zimbalist likewise explains that these losses are economically real and irreplaceable because the season, scouting exposure, and developmental progress achievable only through high-level competition cannot be recreated later. (Zimbalist Decl. ¶¶ 35-36, 47.)

The harm is not speculative. Cruz has entered the portal with a conditional eligibility designation, and two top-tier Division I baseball programs have contacted Cruz regarding interest in rostering him if eligibility continues. (Cruz Decl. ¶ 19.) Those programs have significant NIL budgets and provide MLB Draft development upside. (*Id.*) Without immediate relief, those opportunities will disappear before the Court can hold a preliminary-injunction hearing.

The *Borovicanin* court reached the same practical conclusion on a materially similar record. The court concluded that denying relief would permanently foreclose an irreplaceable fifth season, impairing professional trajectories and eliminating the financial benefits from high level athletic performance. *Borovicanin* at 8-9. Cruz's injury is analogous and narrower: without immediate relief, he loses a Division I baseball season, NIL and revenue-sharing opportunities, and MLB Draft exposure that cannot be recreated after the fact.

### C. The Balance of Equities Favors Cruz

Without relief, Cruz loses the opportunity to compete in Division I baseball and all associated economic and professional-development opportunities—permanently and irreversibly. The NCAA suffers no cognizable harm from allowing one otherwise qualified athlete to be treated as eligible while this case is litigated and while the Court promptly hears the preliminary-injunction request. The NCAA itself has determined that five years of eligibility is appropriate; the only burden from a TRO is applying its own rule to Cruz on an interim basis.

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

The *Borovicanin* court also rejected the NCAA's roster-disruption argument in a materially similar setting. The court emphasized that the plaintiffs were not guaranteed roster spots and were not asking the court to displace any player; they sought only the opportunity to compete for available roster opportunities. *Borovicanin*, at 10. Cruz seeks the same limited relief here. He does not ask this Court to award him a roster spot, expand a roster, or displace another athlete; he asks only to be treated as eligible so Division I programs may decide for themselves whether to recruit and roster him.

**D. The Public Interest Favors an Injunction**

The public interest favors enforcing both federal and Nevada anticompetition policy, along with Nevada contract law and the implied covenant of good faith and fair dealing. The Sherman Act and Clayton Act reflect a strong policy in favor of open competition, and Nevada likewise has a strong public interest in enforcing contracts, protecting reasonable expectations created by governing rules, and preventing unreasonable restraints on competition. An injunction would promote open competition for Division I baseball opportunities, prevent horizontal buyer-side compensation suppression, preserve the Court's ability to grant meaningful relief, and prevent an organization with market power from arbitrarily excluding a Nevada student-athlete from economic opportunity.

The public-interest concerns identified in *Borovicanin* reinforce the need for complete relief here, including protection from the NCAA Manual's Rule of Restitution. The Rule of Restitution, identified in the NCAA Manual as Bylaw 12.11.4.2, permits the NCAA to impose penalties if an athlete competes under a court order that is later vacated, stayed, reversed, or determined to have been unjustified; those penalties can include consequences for the athlete's institution and can chill schools from giving effect to court-ordered eligibility relief. Courts have recognized this dynamic and have enjoined the Rule of Restitution alongside eligibility relief. *Pavia*, 760 F. Supp. 3d at 545; *Ohio*, 706 F. Supp. 3d at 599; *Braham*, 794 F. Supp. 3d at 840; *Martinson*, 804 F. Supp. 3d at 1133. That reasoning supports Cruz's requested protection against the Rule of Restitution and any similar penalty: without that protection, eligibility relief could be

hollow because institutions may decline to roster or compete against Cruz rather than risk NCAA sanctions.

## V. CONCLUSION

For the foregoing reasons, Cruz respectfully requests that this Court issue an *ex parte* temporary restraining order requiring the NCAA to: (1) cease enforcing the spring-2026 carve-out to the 5-in-5 Rule against Cruz; (2) treat Cruz as eligible for the 2026-2027 collegiate baseball season pending the preliminary-injunction hearing; (3) permit Cruz to enter or remain in the Division I baseball transfer portal and be recruited, contacted, offered, rostered, compensated, and treated as eligible by Division I institutions; (4) refrain from enforcing the Rule of Restitution or any similar penalty against Cruz or any institution that rosters or competes against him under this Court's order; (5) set bond at a nominal amount or waive bond under NRCP 65(c); and (6) set Cruz's request for preliminary injunction for hearing as soon as possible.[8]

DATED this 31st day of July, 2026

HOLLAND & HART LLP

/s/ Lucas M. Foletta

Lucas M. Foletta (Nevada Bar No. 12154)
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

*Attorneys for Plaintiff MICHAEL ANTHONY CRUZ, JR*

[8] A proposed order is attached here as **Exhibit 7**.



HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

HOLLAND & HART LLP
5470 KIETZKE LANE, SUITE 100
RENO, NV 89511-2094

## CERTIFICATE OF SERVICE

I, Kelsey Robertson certify:

I am readily familiar with Holland & Hart's practice for collection and processing of: HAND DELIVERIES, FACSIMILES, E-MAILS and OUTGOING MAIL. Such practice in the ordinary course of business provides for the delivery, faxing, e-mailing and/or mailing with the United States Postal Service, to occur on the same day the document is collected and processed.

On the 31st day of July, 2026, I caused the foregoing EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION to be served by the following method(s):

☐ Electronic: filed the document electronically with the United States District Court of Nevada, via the CM/ECF system and therefore the court's computer system has electronically delivered a copy of the foregoing document to the following person(s) at the following e-mail address:

☐ U.S. Mail: a true copy was placed in Holland & Hart LLP's outgoing mail in a sealed envelope addressed as follows

☐ Email: By e-mailing a true copy thereof to the following person(s) at the following e-mail addresses:

☐ Facsimile: by placing a true copy thereof in Holland & Hart's outgoing facsimiles with instructions to fax same to the numbers referenced below:

☑ Hand Delivery: by providing a true and correct copy to Holland & Hart's runners with instructions to hand-deliver the same to the address shown below:

*/s/ Kelsey R. Robertson*
An Employee of Holland & Hart LLP